IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JUAN SYLVESTER BARNES | * | |
| Plaintiff | * | |
| v | * | Civil Action No. DKC-15-3579 |
| KRISTA BILAK, et al. | * | |
| Defendants | * | |

***

**MEMORANDUM OPINION**

Pending are Defendants' motions to dismiss or for summary judgment (ECF No. 42) and to reconsider the court's order granting Plaintiff's *in forma pauperis* status (ECF No. 65) and Plaintiff's motions for injunctive relief (ECF Nos. 59 and 60). Plaintiff opposes Defendants' motion to dismiss or for summary judgment (ECF No. 57 and 58) and Defendants filed a reply (ECF No. 66). After review of the papers filed, the court finds a hearing on the pending matters unnecessary. *See* Local Rule 105.6 (D. Md. 2016). For the reasons set forth below, Defendants' motion, construed as a motion for summary judgment, will be granted and the Clerk will be instructed to mark prior cases filed by Plaintiff as "strikes" pursuant to 28 U.S.C. § 1915(g).

**Background**

This court summarized Plaintiff's complaint allegations in its October 11, 2016 Memorandum Opinion as follows:

> In his complaint (ECF No. 1) as supplemented (ECF Nos. 2, 6 and 7), Plaintiff Juan Barnes alleges that he has been denied both pain medication for a chronic pain condition in his hip and leg and treatment for a broken finger.[1] Barnes states that on October 7, 2015, he requested an increase of his pain medication, Tramadol (100 mg), but received no response. Barnes then filed two additional sick call slips on October 12 and 14, 2015, but again received no response. He states that by October 22, 2015, the pain was so unbearable he asked his mother to call on his behalf, but her attempt to speak with medical

staff was denied. Barnes claims that he signed a release in 2014 permitting medical staff to discuss his care with his mother. ECF No. 1 at pp. 1 – 2.

Barnes continued to request treatment for his pain with the assistance of correctional officers, one of whom spoke with Krista Clark[2] directly. Barnes states that, although Clark assured Officer Self that she would look into why Barnes had not been seen, nothing occurred. Barnes states that on October 26, 2015, he wrote a formal inmate complaint regarding his sick call and asked Officer Ipcuss to call Clark about his pain. Barnes states that Clark said she would see him that day, but he was not seen and he did not receive a response from another sick call slip submitted on November 1, 2015. ECF No. 1 at p. 2.

Barnes states that on November 4, 2015, he broke his finger and informed Officer D. Ellifritz about his injury. Ellifritz called the medical department on Barnes' behalf and reported back to Barnes that their advice was to put a warm compress on his finger and put in a sick call slip. Barnes states that his finger, which he injured in a fall, was swollen and he could not move it. He claims that Ellifritz told the medical staff with whom he spoke that it was "illegal" not to examine Barnes, but they did not change their response and did not view the complaint as one requiring emergent care. Barnes states that he put in a sick call slip for his finger and received no response. ECF No. 1 at pp. 2 – 3.

Barnes states that on November 5, 2015, Krista Bilak took away all of his medication prescribed for pain (Tramadol) and for psychiatric symptoms of auditory and visual hallucinations (Risperidol). Barnes states that on November 4, 2015, he also received an adjustment ticket for passing a magazine to another inmate, which he admits doing. When the other inmate was found with the magazine, it was discovered that two medications, Tegretol and Neurontin, were hidden inside of it. Barnes states that he does not take those medications, but his prescriptions were revoked regardless. He claims that no effort was made to determine whether the medication found in the magazine was something he had access to before his prescriptions were summarily revoked and he attributes these actions to the fact that he is African American. Barnes claims that there is also video evidence that proves he took his medication in the pill line that day, making it impossible for him to give it to someone else. He alleges that the other inmate, Jeremy Cochran, who was caught with the magazine did not have his prescriptions revoked because he is White. ECF No. 1 at pp. 3 – 4.

Barnes claims, in the first supplemental complaint, that medical staff were still refusing to see him as of November 18, 2015, even though they had been in the disciplinary segregation unit, where he was housed, seeing other inmates all week. Barnes further states that the Adjustment Hearing Officer found him not guilty on the charge regarding the medication because the pills in question were never confiscated and taken to a nurse for identification. Barnes states that, notwithstanding that fact, Bilak took his medication, including Risperidol

and Prozac which he had been prescribed for treatment of his mental health issues. He states that the termination of this medication adversely affected his mental state. Barnes further alleges that his broken finger remained untreated as of November 18, 2015. ECF No. 2 at p. 1.

In another supplemental filing Barnes states that he still had not been seen by Krista Bilak as of November 24, 2015. He states that several people have tried to tell Bilak that Barnes did not pass his medication to anyone and claims Bilak could simply verify that fact by watching the tier video footage from November 4, 2015, showing that he took his medication in the pill line. He maintains that Bilak's sole motive for removing his health care plan and medication is the fact that he is African American and states that correctional officers will verify that Barnes did not engage in any wrong-doing. ECF No. 5 at pp. 1 – 2.

Barnes claims that he is the only inmate who is denied access to his medical record despite his numerous requests. He states that the chronic pain, which stems from a healed fracture in his leg, was only effectively treated with Tramadol. Barnes states that prior to receiving Tramadol, he was prescribed Naproxen, Baclofen, Elavil, Mobic, Roboxen, Neurontin, Tegratol, Tylenol, Aspirin, and Motrin, but none of it relieved his pain. He claims that when he asked for his Tramadol dose to be increased, Bilak used the "fact I was caught with someone else's pills" to revoke the prescription. ECF No. 5 at p. 4. He asserts that he could have beaten the charges against him, but he took responsibility for passing the magazine and maintains it had nothing to do with his medications. *Id*.

Barnes claims in another supplemental paper that on November 22, 2015, he saw Bilak walking on the tier with an officer who was escorting her to cell 15. He states that he banged on his door and yelled, "why are you doing this to me?" Barnes claims that Bilak turned, looked at him, laughed, and waved as she continued to walk past his cell. ECF No. 6 at p. 2.

Barnes states in another supplemental complaint that on December 2, 2015, he saw "a spokesperson" for Bilak and claims Bilak was still ignoring him. He states this "Indian man" ordered medication for him, but prescribed a 50 mg dose of Tramadol instead of the 100 mg dose he had requested. The prescription was written for four weeks. ECF No. 7 at p. 1.

Barnes asserts that he should be receiving the treatment that has proven effective for managing his pain, which was 100 mg of Tramadol. He further alleges that his complaint regarding his finger remained unaddressed in December of 2015. ECF No. 7 at p. 2.

Barnes alleges that Bilak and "several other Wexford providers" are aware of the pain he suffers based on his hospital and jail medical records, yet they have

> taken no action in two years to determine the source of his pain. He states that when he broke his femur bone a metal rod was put into his leg and he later developed hip degeneration. The chronic pain he experiences dates back to 2008. ECF No. 11 at p. 1.
>
> Barnes again alleges that the prescription for 100 mg of Tramadol was unjustly stopped after the November 4, 2015 incident despite the fact that his medication was not a part of that incident. He further claims that he is being denied "all care" and the resulting pain is "interfering with daily activities." ECF No. 11 at p. 2.
>
> On January 19, 2016, Barnes filed a complaint with prison staff, asserting that he was seen by William Beeman but was not prescribed pain medication. His complaint received no substantive response because it was written on the wrong form. ECF No. 15 at p. 2, *see also* ECF No. 15-1. Barnes claims that this refusal to respond to his claim is retaliation for having filed the instant case. *Id*. at p. 1.
>
> ---
>
> 1 Barnes abandons the claim regarding the failure to address the injury to his finger in his later filed papers.
>
> 2 It is unclear if "Krista Clark" is a different member of medical staff, or if Barnes mistakenly wrote "Clark" instead of "Bilak."

ECF No. 34 at pp. 1 – 5.

Defendants' filed a motion to dismiss (ECF No. 20) in response to Plaintiff's complaints, which was denied without prejudice by this court because it did not adequately address Barnes' colorable claim of an Eighth Amendment violation. ECF Nos. 34 and 35. Specifically, this court found that:

> In the absence of any verified records or sworn statements disputing Barnes' claims that his pain medication was discontinued for reasons unrelated to the November 4, 2015 incident, Defendants are not entitled to summary judgment in their favor. Moreover, the complaint allegations state a colorable claim for relief, making dismissal under Fed. R. Civ. Proc. 12(b)(6) inappropriate. Barnes's claims that Bilak was informed that the infraction did not involve his medication; that Bilak discontinued his prescription because of her bias against him and insured that discontinuation remained in place in retaliation for the instant lawsuit; and that Bilak knew or should have known that discontinuing

> Tramadol and Neurontin for Barnes would result in an increased amount of pain, have not been adequately addressed by Defendants.

ECF No. 34 at p. 13.

Defendants now provide verified medical records and sworn statements from pertinent parties to support their motion to dismiss or for summary judgment. ECF No. 42. Defendant Krista Bilak, CNP, avers that the basis for discontinuation of Barnes's prescription for Tramadol was his disciplinary infractions for possession of unauthorized medication or hoarding prescribed medication. ECF No. 42-10 at p. 2. In the first of the two infractions, Barnes was found to be in possession of Buprenorphine during a cell search on October 28, 2015. *Id*. Bilak explains that this particular drug is not prescribed or authorized for use in the prison, thus Barnes could not have had a valid prescription for it. *Id*. The second infraction involved Barnes carrying a magazine out of his cell which he attempted to pass to another inmate. *Id*. The magazine was found to contain six Tegretol and two Neurontin, both of which are medications that were being prescribed to Barnes at the time. *Id*. at p. 3.

In his opposition response, Barnes disputes that the Buprenorphine infraction occurred on October 28, 2015, and states that both infractions concern events that occurred on November 4, 2015.[1] ECF No. 47 at p. 2; ECF No. 49 at p. 1. He states that the Buprenorphine fell out of the magazine while it was in his cell and that he had no idea it was in the magazine. ECF No. 49 at pp. 1, 11-12; ECF No. 58 at p. 4. He further claims that the only reason he passed the magazine is he was "asked" to by members of a prison gang (the Black Guerilla Family or BGF) and declining to do so would have meant he would have been assaulted. ECF No. 48 at p. 1; ECF No. 49 at pp. 11-12. Barnes also claims he was found not guilty of the rules Bilak claims; however, a review of the adjustment hearing documents reveals Barnes agreed to plead guilty to

[1] The court notes that Bilak is a member of the medical staff and was not involved in the issuance of either infraction, thus the discrepancy over the date of the first infraction is without significance for purposes of this case.

violating Rules 112, 304, and 406 in exchange for the Rule 111 charge being dropped. ECF No. 60-1 at p. 1. Rule 112 prohibits possession or use of a drug or controlled dangerous substance; Rule 304 prohibits possession, use, hoarding, or accumulation of medication without authorization; and Rule 406 prohibits possession of or passing of contraband. ECF No. 60-1 at p. 2.

Bilak states that she was informed of the rule violations and that it is her routine practice to discontinue "all frequently abused medications the inmate is taking" when he is charged with possession, use, or hoarding of a frequently abused drug. ECF No. 42-10 at p. 3. She states medication is discontinued regardless of whether the inmate is found in possession of the particular medications prescribed and discontinued. *Id*. Both Tramadol and Neurontin are frequently abused in the prison due to the euphoria that higher doses of both can cause. *Id*. In addition, Bilak notes that high doses of Neurontin are lethal and also can affect the central nervous system causing tremors, edema, double vision, slurred speech, and an increase in agitation or hostility. *Id*. Bilak states that Tramadol can also be harmful or lethal if abused. *Id*. She further observes that inmates who are found violating rules regarding hoarding of medication or possession of unauthorized medication are more likely to misuse their own medications. *Id*. at pp. 3 – 4. Barnes' Tramadol and Neurontin prescriptions were therefore discontinued in order to prevent potential misuse of those medications or an overdose by Barnes or another inmate. *Id*. at p. 4.

Barnes disputes that his medication was discontinued for the reasons stated by Bilak and relies on the fact that he was prescribed Neurontin by Dr. Ashraf after Bilak's initial discontinuation and that Bilak prescribed Nortriptyline after the infractions. ECF No. 48 at p. 3; ECF No. 58 at p. 1. Barnes seems to imply that if Bilak thought he was misusing medication she

would not have given him a prescription for any other medication. He does not dispute Bilak's observation that Tramadol is subject to misuse or abuse.

Bilak denies discontinuing Barnes' prescriptions for Risperidol or Prozac and denies discontinuing the Tramadol and Neurontin because of Barnes's race. ECF No. 42-10 at p. 4. Bilak states that in an effort to address Barnes' claims that he suffers pain, she prescribed 500 mg of Naproxen twice a day because she felt it was a clinically appropriate alternative based on her knowledge of Barnes's condition. *Id*. Bilak explains that inmates cannot request an appointment with a specific provider by sick call slip and that she has not refused to see Barnes as he claims. *Id*. at p. 5. She states that when a sick call request is made that requires a referral to a higher level provider, assignment to the higher level provider is random and based on who is available that day. *Id*. Bilak further states that she does not know who she will see each day until she arrives at work each morning and that she is only allowed on the prison housing units in cases of emergencies and must be escorted by a correctional officer when she goes there. *Id*. She denies Barnes' claim that she laughed and waved when he saw her in the housing unit. *Id*.

When Bilak saw Barnes on April 26, 2016, she noted that Dr. Ashraf had prescribed Neurontin and that Barnes had requested an increase in the prescription, four days after it had been renewed. ECF No. 42-10 at pp. 6, 7. Bilak states that this concerned her because Neurontin was one of the drugs involved in the infraction to which Barnes pled guilty. *Id*. at p. 6. Bilak noted that Barnes had been prescribed Celexa, an antidepressant which has been shown effective in treating chronic pain. *Id*. Bilak discontinued the Neurontin prescription based on her concerns and prescribed 500 mg of Naproxen twice daily which she believed would treat Barnes' pain when combined with the Celexa. *Id*.

Bilak again saw Barnes on June 27, 2016, when he reported that the Neurontin and Mobic he was receiving was not adequately addressing his pain. *Id*. Bilak examined Barnes and reviewed his x-rays which revealed "intact hardware with no acute processes that would indicate an etiology for his level of pain." *Id*. Barnes was still on Celexa and, in light of his complaints that the medications provided were ineffective and his history of abuse, Bilak discontinued Neurontin. *Id*. She prescribed Nortriptyline and Indomethacin to treat Barnes's pain because based on her "clinical evaluation . . . [she] believed that this medication was a reasonable alternative to the Tramadol/Neurontin and would address [Barnes'] pain if given ample opportunity." *Id*. Bilak explains that Nortriptyline, like other chronic pain medications, is not immediately effective and takes several weeks to reach maximum effectiveness. *Id*.

Barnes was again seen by Bilak on July 8, 2016, for complaints that his femur hurt which was a change from his prior complaints that his hip and back hurt. ECF No. 42-10 at p. 7. Bilak ordered an x-ray of his femur, requested a clinical pharmacology consult, and recommended that Barnes continue to take the medication prescribed to give it an opportunity to begin working as well as a follow-up with a provider in 30 days if Barnes saw no improvement. *Id*. The x-ray taken on July 12, 2016, revealed no abnormality that would explain the level of pain Barnes was reporting. *Id*.

On August 12, 2016, Barnes tested positive for Codeine and Morphine; he tested positive again for these drugs on September 2 and 22, 2016. ECF No. 42-10 at p. 7. Barnes did not have a prescription for Codeine or Morphine, thus his prescription for Nortriptyline was discontinued. *Id*. Barnes continued to receive Celexa. *Id*. Barnes attempts to explain the positive tests for Codeine and Morphine, by claiming that it is Bilak's fault for discontinuing his medication. ECF No. 48 at p. 3. He states he had to take matters into his own hands and took Tylenol 3 that was

prescribed to another inmate, Bob Turner. ECF No. 58 at p. 2. Barnes further claims that taking another inmate's medication is not misuse of medication since he took only the prescribed amount. ECF No. 60 at pp. 3– 4.

Janice Gilmore, Regional Administrator for Wexford Health Sources, Inc., provides an affidavit in support of Defendants' motion to dismiss or for summary judgment. Barnes previously alleged that Gilmore had directed reinstating his medication because she had concluded it was "unjustly taken" after his attorney spoke with her. Gilmore avers that she does not recall speaking with either Barnes or an attorney claiming to represent him and that she never instructed anyone to restore his medications, nor did she find it was unjustly taken. ECF No. 41-11 at p. 2. Gilmore further states that she has no knowledge of any meeting during which Barnes' treatment was discussed or a decision to deny same was made for "finance issues." *Id*. She explains that when a consultation is ordered a request is sent to a collegial board made up clinicians for approval and the board determines if it is medically indicated or appropriate. *Id*. Gilmore further states that she is not a clinician. *Id*.

Barnes appears to change his allegation regarding Gilmore and now states that the attorney who spoke with her represented a different inmate, Willie Bryant. ECF No. 48 at p. 2. Barnes does not explain why an attorney who does not represent him would speak with Gilmore on his behalf, nor does he indicate why he believes this occurred but nevertheless states that Gilmore is lying when she denies any recollection of speaking with an attorney about Barnes' case.

The verified medical records indicate that Barnes' chief complaint is chronic pain in his right hip joint as well as his back caused by a history of a fractured right femur bone which required surgical repair with metal implants in 2009. ECF No. 42-3 at p. 5. In 2014, Barnes

asked for a prescription for Tramadol and he was told the drug was considered a narcotic and he was advised that the NSAID he was taking, Robaxin, becomes more effective when it is taken regularly. *Id*. (Record dated December 8, 2014). Krista Swan, RN, told Barnes on January 10, 2015, that Tramadol was not meant for long-term use. *Id*. at p. 8. On January 19, 2015, when Barnes reported that the Robaxin he was taking was not helpful, Mobic was ordered. *Id*. at p. 10.

On April 2, 2015, Barnes was prescribed Tramadol 50 mg twice a day and Nortriptyline 25 mg daily. On April 28, 2015, Barnes was seen by James Hunt, RN, regarding his request to increase the Tramadol dosage prescribed. ECF No. 42-3 at p. 16. Barnes told Hunt that he was on 200 mg of Tramadol in 2012. *Id*. On May 1, 2015, Barnes reported there was no difference in his pain level since starting Tramadol at 50 mg, twice a day and claimed the effect only lasted approximately 20 minutes ECF No. 42-3 at p. 19. Although he was asking for the Tramadol to be doubled in dosage, an order was written to increase the dosage of his Nortriptyline instead. *Id*. at p. 20.

On July 8, 2015, Barnes' Tramadol prescription was renewed until November 8, 2015, following a consultation with a clinical pharmacologist. ECF No. 42-3 at p. 26. Barnes was also prescribed 75 mg of Nortriptyline. *Id.* On August 5, 2015, Krista Swan indicated that Barnes' prescription for Tramadol would be increased to 100 mg twice a day after a new limp was documented. *Id*. at p. 28. The prescription for Tramadol was set to expire on December 5, 2015. *Id*.

On October 4, 2015, Barnes sent in a sick call slip stating he was "ready to increase [his] Tramadol." ECF No. 42-4 at p. 25. As an alternative to increasing the dosage of Tramadol, Barnes suggested that medical staff write an order for him to be fed in his cell. Barnes was seen on October 6, 2015, by Krista Swan, who found no evidence that he required either feed-in status

or an increase in his Tramadol dosage. Swan educated Barnes on arthritic pain and advised him to continue moving.

On November 5, 2015, Bilak discontinued Barnes' prescriptions for Tramadol and Neurontin and replaced those prescriptions with Naproxen. ECF No. 42-3 at p. 32. Barnes was seen on November 27, 2015, by Ricki Moyer, RN, who reported that Barnes did not know why his medication was discontinued. *Id*. at p. 35. Moyer noted that Barnes asked for the medication to be reinstated and that it was explained to Barnes that his medication was discontinued due to misuse of medication as evidenced by his recent infraction. *Id*. Moyer notes that Barnes then became very argumentative, stating that medical staff are not allowed to take his pain medication away because a judge said so. *Id*.

On December 2, 2015, Dr. Ashraf reordered Barnes' prescriptions for Tramadol and Neurontin based on his mistaken belief that the prescriptions had simply expired. ECF No. 45-1 (Affidavit of Mahboob Ashraf, M.D.). Barnes submitted a sick call slip on December 9, 2015, asking that the dosage for his Tramadol prescription be increased, but he refused to be seen by a registered nurse in response to his request. ECF No. 42-3 at p. 39. The following day, Ashraf discontinued the prescriptions for Tramadol and Neurontin because he learned that Barnes was removed from those medications due to misuse of medication. *Id*. at p. 40; *see also* ECF No. 45-1. Dr. Ashraf prescribed Neurontin (400 mg) twice a day to treat Barnes' pain on January 7, 2016. ECF No. 42-3 at p. 41. He noted on April 22, 2016, that he considered starting Barnes on Cymbalta but because Barnes was already taking Celexa it was not prescribed. *Id*. at p. 53. Dr. Ashraf was concerned about Serotonin Syndrome[2] and continued Barnes on Neurontin instead of adding Cymbalta. *Id*.

---

[2] "Serotonin is a chemical produced by the body that enables brain cells and other nervous system cells to communicate with one another. Too little serotonin in the brain is thought to play a role in depression. Too much,

X-rays of Barnes' leg performed on two different occasions revealed no abnormalities. The hardware in Barnes' leg for repair of a fracture was described as intact and the alignment of his leg and hip described as anatomical. ECF No. 42-4 at pp. 7 – 8, 15.

Barnes' numerous papers filed in response to Defendants' motion to dismiss or for summary judgment repeat his previously made allegations that Bilak's motive in cancelling his prescriptions was to induce pain, retaliate against him, or was otherwise improper. *See* ECF No. 58 at p. 7 (alleging inmates "with skin lighter than [Barnes]" do not have their medications discontinued). Barnes focuses on the facts surrounding the infraction involving the magazine and insists that he did not know there were medications in the magazine; the medication was not Tramadol; and he was found "not guilty" for one of the multiple rule violations charged so Bilak should have reinstated his prescription. ECF Nos. 47, 48, 49, 58. Barnes further insists that a copy of the video footage of the incident with the magazine would establish his version of events. He claims the video would establish that he took his medication the morning of November 4, 2015, and therefore he could not have passed his medication in the magazine. ECF No. 59 at p. 4. Barnes also claims that all of his medication was crushed and put into water, making it impossible for him to pass it to another inmate. ECF No. 58 at p. 1.

With respect to his pain, Barnes claims that no other medication has worked to address his pain like Tramadol and that he could access much stronger narcotics such as heroin or K-2 if he just wanted to get high. ECF No. 60 at p. 4. Barnes explains that the urine tests that came back positive for codeine and morphine were due to the fact his pain was not being addressed and he obtained Tylenol-3 from another inmate. ECF No. 47 at p. 3; ECF No. 48 at p. 3; ECF

---

however, can lead to excessive nerve cell activity, causing a potentially deadly collection of symptoms known as serotonin syndrome." *See* http://www.webmd.com/depression/guide/serotonin-syndrome-causes-symptoms-treatments#1. Symptoms include confusion, agitation or restlessness, dilated pupils, headache, rapid heart rate, tremor, loss of muscle coordination, shivering, and heavy sweating. *Id*. Serotonin syndrome can be caused by "taking two or more drugs [such as antidepressants] and/or supplements together that influence serotonin." *Id*.

No. 49 at pp. 3–4. Although Barnes asserts that Defendants are deliberately indifferent to his pain, he admits that he has refused to take medications, such as Naproxen and Mobic, which were prescribed to address his pain, based on his claim that those medications did not work in the past. ECF No. 49 at pp. 4-5, 13. He asserts that prescribing medication that is ineffective constitutes deliberate indifference. ECF No. 58 at p. 3. Barnes also claims that Bilak's assertion that the Celexa he takes can be used for pain relief is incorrect as he has been on that medication since he was 7 years old and it has no effect on pain. ECF No. 49 at p. 8.

**Standard of Review**

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002). The court

must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

**Analysis**

Eighth Amendment Claim

An Eighth Amendment claim may be stated where prison medical staff are deliberately indifferent to an objectively serious medical condition. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

The objective evidence provided in this case establishes that there were legitimate reasons to discontinue Barnes' medications, including the potential for abuse or misuse of medication that could harm either Barnes or another inmate. Prison medical staff are not required to investigate and prove beyond all doubt that a particular inmate is abusing pain medications, especially where, as here, there is adequate circumstantial evidence that establishes Barnes' propensity to abuse medications. The Constitution does not guarantee a prisoner the medical treatment of his choice and Barnes' disagreement with the decision to discontinue Tramadol prescriptions is simply not a valid basis for an Eighth Amendment claim.

The right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir. 1970)). Where,

as here, there is evidence that providing the treatment demanded by Barnes is potentially harmful to him and to other inmates in the general population, there are no exceptional circumstances warranting a finding that this disagreement is sufficient to state an Eighth Amendment claim.

Retaliation Claim

A bald allegation of retaliation, such as the one leveled at Bilak by Barnes, is subject to dismissal. "A complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone." *Gill v. Mooney*, 824 F.2d 192, 194 (2nd Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)); *Pierce v. King*, 918 F. Supp. 932, 945 (E.D. N.C. 1996) (*judgment vacated on other grounds*, 525 U.S. 802 (1998) (conclusory allegations of retaliation insufficient to state claim). There is no objective evidence to suggest that any of the decisions made by Bilak regarding Barnes' care were motivated in any way by a retaliatory animus. Rather, the discontinuation of Barnes' medication was occasioned by his admitted misuse of prescription drugs, including taking pain medication prescribed to another inmate.[3] The retaliation claim is subject to dismissal.

**Injunctive Relief**

Barnes filed a motion for temporary restraining order (ECF Nos. 59 and 60) seeking an order from this court requiring Bilak to treat Barnes and reinstating his prescription for Tramadol. A preliminary injunction is an extraordinary and drastic remedy. *See Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). To obtain a preliminary injunction, a movant must demonstrate: 1) that he is likely to succeed on the merits; 2) that he is likely to suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities tips in his favor; and 4)

[3] This court recognizes that Barnes may have resorted to taking medication prescribed to another inmate because his pain is inadequately addressed by the medication he is prescribed, but also notes that Barnes is unwilling to cooperate with efforts to treat his pain with non-narcotic medications which contributes to the perpetuation of his pain. In short, Barnes cannot claim he is in pain and refuse treatment prescribed for it by medical professionals in favor of medication of his choosing without appearing to be engaging in drug-seeking behavior.

that an injunction is in the public interest. *See Winter v. Natural Resources Defense Council, Inc*, 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. Federal Election Commission*, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089 (2010), reinstated in relevant part on remand, 607 F.3d 355 (4th Cir. 2010) (*per curiam*). Given the facts as established in both the records and sworn statements by the parties, an injunction, preliminary or otherwise, is not warranted in this case. Barnes, like all other inmates, has no right to demand to be seen by a particular member of the medical staff. The evidence of possible drug abuse or misuse by Barnes weighs heavily against the issuance of an injunction requiring a prescription for a narcotic pain reliever. Additionally, there is evidence that Defendants are attempting to treat Barnes' pain with other prescription medication, which he refuses to take. The potential for harm to Barnes if the injunctive relief sought is not awarded is non-existent. Indeed, it would appear that the potential for harm would increase if Barnes was awarded the injunctive relief sought. The motion for temporary restraining order will be denied.

**Motion for Reconsideration**

On February 28, 2017, Defendants filed a motion for other relief to reconsider order granting plaintiff's motion to proceed *in forma pauperis*. ECF No. 65. They assert that Barnes should not have been granted leave to proceed *in forma pauperis* because on three prior occasions he filed actions in this court while he was incarcerated that were dismissed for failure to state a claim upon which relief could be granted. The three cases Defendants rely upon are: *Barnes v. Kelly*, Civil Action DKC-13-281 (D. Md.); *Barnes v. Ottey, et al.*, Civil Action DKC-14-2904 (D. Md.); and *Barnes v. Joubert, et al.*, Civil Action DKC-15-560 (D. Md.). ECF No. 65 at pp. 1 – 2. Each of the cited cases was dismissed for failure to state a claim upon which relief could be granted.

Under 28 U.S.C. §1915(g)

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

*Id*. Where a complaint is dismissed for failure to state a claim upon which relief may be granted under Fed. Rule of Civ. Proc. 12(b)(6), the dismissal counts as a "strike" under the provisions of § 1915(g). *See Blakely v. Wards*, 738 F.3d 607, 610 (4th Cir. 2013). Although the dismissals in the noted cases did not provide Barnes with a warning regarding the effect of the dismissal on his future ability to file cases *in forma pauperis*, and did not direct that the cases be marked as "strikes," it is clear that the three cases noted qualify as § 1915(g) dismissals. Thus, the Clerk will be directed to mark the cases as strikes, but given that Barnes had not been forewarned at the time this court granted his motion to proceed *in forma pauperis*, his status in this case will remain unchanged. Barnes is now on notice, however, that any future lawsuits filed must be accompanied by the full filing fee ($400), or he must show that he is in imminent danger of serious physical injury. Absent the filing fee or a showing of imminent danger, future complaints filed by Barnes will be summarily dismissed.

**Conclusion**

A separate Order implementing the content of this Memorandum Opinion follows.

March 29, 2017

___________/s/_________________
DEBORAH K. CHASANOW
United States District Judge